IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WEINEL GROUP CORP. d/b/a ROCK-N-RESCUE,** | |
| **Plaintiff,** | Civil Action No. 2:26-cv-00177 |
| v. | **JURY TRIAL DEMANDED** |
| **JOHN MORGAN,** | |
| **Defendant.** | |

## COMPLAINT IN CIVIL ACTION

AND NOW, comes the Plaintiff, Weinel Group Corp. d/b/a Rock-N-Rescue, by and through its counsel, Justin A. Rick, Nicholas R. Jimenez, and The Lynch Law Group, LLC, and files this Complaint in Civil Action against John Morgan and in support of its claims, avers as follows:

## PARTIES

1. Plaintiff, Weinel Group Corp. d/b/a Rock-N-Rescue ("RNR" or the "Company') is a Pennsylvania corporation that maintains its principal place of business at 300 Delwood Road, Butler, Butler County, Pennsylvania 16001.

2. Defendant John Morgan is an adult individual who resides in Butler County, Pennsylvania.

## JURISDICTION AND VENUE

3. This case arises out of the Defendant's infringement of RNR's registered marks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114 (a).

4. Therefore, this Honorable Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1338(a).

5.	This Honorable Court has supplemental jurisdiction over RNR's state law claims pursuant to 28 U.S.C. § 1367 as such claims arise from the same transactions and occurrences as the claims based on Federal law and there is no novel question of state law.

6.	Personal jurisdiction and venue are proper in the Western District of Pennsylvania because the Parties are domiciled in the Western District of Pennsylvania, and the transactions and occurrences that form the basis of Plaintiff's claims occurred within the jurisdictional limits of the Western District of Pennsylvania.

## STATEMENT OF FACTS

7.	RNR is the successor in interest to J.E. Weinel, Inc., and is a family-owned business founded in 1982 that supplies equipment to first responders, fire departments, police, emergency medical services, and other industries that need top quality harnesses, rigging, ropes, and other similar equipment.

8.	In 2014 RNR hired the Defendant as a salesman.

9.	Over the years of Defendant's employment, Defendant was promoted commensurate with his increased responsibilities.

10.	At the time of his termination, Defendant held the title of Vice President.

11.	While the Defendant was employed with RNR, his job responsibilities included bookkeeping, sales, and marketing.

12.	Defendant also served as a volunteer board member of the Pullman Park Authority and on the Butler City Council during certain periods of time during his employment with RNR.

13.	On February 7, 2025, RNR discovered that Morgan had been misappropriating company funds.

14. Plaintiff discovered that Defendant had misappropriated Company funds by, *inter alia,* paying personal bills as if they were business expenses. By way of example, Defendant without authorization:

    a. Paid for his personal Ring camera using his RNR business credit card;

    b. Paid for Facebook ads for unrelated enterprises such as the Pullman Park Authority using his RNR credit card;

    c. Paid for website domain fees incurred by the Pullman Park Authority via a check from the RNR business account that Defendant later characterized as a business expense;

    d. Paid expenses for unrelated enterprises with his RNR credit card such as supplies for the Pullman Park Authority, and the Butler City Counsel; and,

    e. Purchased various items for his personal use using RNR's Amazon account and payment methods.

15. Additionally, Plaintiff discovered Morgan had been using RNR's funds to pay expenses for an entity unrelated to the Company by making purchases, then submitting the expenses for reimbursement and depositing the reimbursement to his personal account. By way of example, transactions falling into this category include expenses related to the Pullman Park Authority including costs associated with:

    a. operating and maintaining the Pullman Park Authority website domain;

    b. purchasing and maintaining concession equipment;

    c. advertising expenses for Pullman Park Authority;

    d. Pullman Park field maintenance; and,

    e. Pullman Park Authority staff training.

16. To conceal his improper use of Company funds, Morgan utilized vendors with a pre-existing business relationship with RNR, such as Ring, Facebook ads, GoDaddy, and Amazon.

17. By utilizing vendors that regularly do business with RNR, Morgan was able to divert company funds for his personal gain while avoiding RNR's reasonable efforts to monitor how its funds were utilized.

18. On February 8, 2025, RNR's senior management confronted Morgan about the misuse and misappropriation of company funds.

19. During that meeting Morgan admitted that he "made a mistake" by using company funds for personal expenses and for the benefit of the other organizations with which he is involved.

20. RNR terminated the Defendant at that February 8, 2025, meeting.

21. After his termination, RNR discovered that the Defendant had, at an unknown time, accessed RNR's proprietary and confidential company data to obtain a list of RNR's customers and order information.

22. At an unknown time prior to, or shortly after, Defendant's termination, Defendant also obtained an unauthorized copy of RNR's list of vendors and suppliers, product pricing data, and advertising data.

23. Upon information and belief, Defendant also took a copy of RNR's website data which included advertising, search engine optimization, sales, and other proprietary and confidential information that belonged to RNR.

24. RNR's vendor, supplier, pricing and advertising data is comprised of proprietary and confidential business information that RNR developed and curated at substantial cost in time and money.

25. RNR kept its customer, supplier, and vendor lists confidential and did not make these lists available to anyone other than high level employees.

26. Defendant knew that RNR's customer, supplier, and vendor lists were confidential and proprietary information that RNR would never share with anyone outside of the organization.

27. Defendant used the supplier and vendor information obtained to purchase components similar to those used by RNR with the intention of passing the counterfeit products off as if they were RNR's.

28. Defendant then used RNR's customer list to solicit RNR's customers to purchase his counterfeit products.

29. RNR holds five active trademarks in addition to its abandoned trademarks and other unique and distinctive identifying names, logos, and slogans that are entitled to common law trademark protection due to their continuous use in commerce.

30. RNR trademarked "Rock-N-Rescue".

31. RNR also uses a logo and the prefix "RNR" to identify its products in the market.

32. RNR's trademarks apply to one of the unique products it produces which is known as the "RNR Personal Escape Kit".

33. The RNR Escape Kit consists of a brightly colored neon green rope, hook, and storage pouch.

34. On November 24, 2025, a fire department that routinely purchases RNR equipment reached out to RNR regarding a defective personal escape kit.

35. After further investigation, the fire department produced an invoice from First Choice Safety Solutions Gear Shop for a "RNR Personal Escape Kit". A copy of the invoice is attached as Exhibit A.

36. RNR never produced the escape kit listed on this invoice.

37. Upon information and belief Defendant was employed with First Choice for an unknown time period in 2025 that, upon information and belief, corresponded and overlapped with the sale of counterfeit products by First Choice.

38. Upon information and belief, Defendant misled First Choice into believing Defendant's counterfeit products were genuine RNR products.

39. Upon information and belief, Defendant produced and sold a counterfeit of the RNR Personal Escape Kit in an attempt to mislead consumers into thinking the kit was produced by RNR.

40. Upon information and belief Defendant produced and sold counterfeit products that used RNR's name and likeness to profit from RNR"s reputation, and the RNR personal escape kit is simply one example of Defendant's efforts to infringe on RNR's trademarks.

41. Upon information and belief Defendant produced and sold these products through his then-current employers, and also individually.

42. Defendant infringed on RNR's trademarks by using RNR's name and likeness to sell a counterfeit version of a product that RNR produces.

43. Defendant intended to mislead consumers into believing he was selling RNR's product.

44. By producing counterfeit products that were passed-off as RNR's, Defendant harmed RNR, including by:

  a. diluting RNR's trademarks;

  b. creating confusion in the market; and,

  c. harming the goodwill that RNR has developed in the fire, rescue, and first responder community for more than a generation.

45. After his termination, Defendant also made false and misleading statements to third parties including, *inter alia*:

    a. alleging he was terminated because he spent too much time away from work caring for sick family members;

    b. stating that RNR's products were inferior in quality, or defective in design; and,

    c. falsely alleging that RNR products lack specific safety certifications.

46. As a result of Defendant's defamatory statements, RNR's reputation in the rescue community has been harmed.

## Count I – Trademark Infringement (15 U.S.C. § 1114)

47. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 46 as if fully set forth herein.

48. RNR owns active trademarks for its name, logo, and specific products it produces. RNR has Federally registered trademarks under the following serial numbers: 88412284; 88411397; 88411387; 98037811; 98039211; 98039281.

49. RNR holds valid and protectable trademarks.

50. RNR has used its trademarks in commerce since its founding.

51. One distinctive product manufactured, marketed, and sold by RNR is the "RNR Personal Escape Kit".

52. The kit in question consists of a brightly colored neon green rope, hook, carabiner, decent device, and storage pouch.

53. The components of the kit in question are assembled by RNR, with final sewing performed in-house at RNR to its specifications.

54. The finished kit is then sold in a distinctive storage pouch.

55. Upon information and belief, Defendant produced and sold a counterfeit RNR Personal Escape Kit in an attempt to mislead consumers into thinking the kit was produced by RNR.

56. Defendant infringed on RNR's trademarks by using RNR's name and likeness to sell a counterfeit version of a product that RNR produces.

57. Defendant created a product with the intention of deceiving consumers about the source of the goods.

58. Defendant intended to mislead consumers into believing he was selling RNR's product.

59. RNR believes and therefore avers that there are other instances where Defendant infringed on its trademark that must be developed through further discovery.

60. RNR was harmed as a result of Defendant's infringement because the Defendant benefitted from the use of RNR's name, image, and likeness while passing off products as if they were RNR's.

**Count II – Misappropriation of Trade Secrets (18 U.S.C. §§ 1832, 1836 et seq.)**

61. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 60 as if fully set forth herein.

62. RNR possessed trade secrets as defined by 18 U.S.C. § 1839.

63. RNR's proprietary website data, including customer information and customer lists, supplier lists, and vendor lists, are trade secrets because RNR derives independent economic value from its customer lists not being generally known.

64. RNR makes reasonable efforts to maintain the secrecy of its customer, vendor, and supplier lists and has never authorized sharing these lists with any third-party.

65. RNR's customer, vendor, and supplier lists are not generally known or readily ascertainable.

66. RNR's trade secrets were communicated to Defendant pursuant to a confidential relationship because Defendant was only permitted access to RNR's trade secrets by virtue of his position as Vice President.

67. Defendant used Plaintiff's trade secrets in violation of that confidence.

68. After his termination on February 8, 2025, Defendant used Rock-N-Rescue's trade secret information to solicit Rock-N-Rescue's customers.

69. Defendant also used RNR's trade secret information to solicit RNR's vendors and suppliers which permitted him to benefit from RNR's labor in a manner that was not otherwise possible.

70. Defendant used RNR's proprietary pricing and advertising data to support his efforts to compete with RNR.

71. RNR suffered harm as a result of Defendant's misappropriation of its trade secrets including the loss of its competitive advantage in the industry.

72. Defendant's use of RNR's proprietary website data to solicit its customers caused financial harm to RNR through loss of customers and business.

**Count III – Misappropriation of Trade Secrets (12 Pa.C.S.A. § 5301 et seq.)**

73. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 72 as if fully set forth herein.

74. RNR possessed trade secrets as defined by 12 Pa.C.S. § 5302.

75. RNR's proprietary website data, including customer information and customer lists, supplier lists, and vendor lists, are trade secrets because RNR derives independent economic value from its customer lists not being generally known.

76. RNR makes reasonable efforts to maintain the secrecy of its customer, vendor, and supplier lists.

77. RNR's trade secrets were communicated to Defendant pursuant to a confidential relationship because Defendant was only permitted access to RNR's trade secrets by virtue of his position as Vice President.

78. Defendant used Plaintiff's trade secrets in violation of that confidence.

79. After his termination on February 8, 2025, Defendant used RNR's trade secret information to solicit RNR's customers.

80. Defendant also used RNR's trade secret information to solicit RNR's vendors and suppliers which permitted Defendant to benefit from RNR's labor in a manner that was not otherwise possible.

81. RNR suffered harm as a result of Defendant's misappropriation of its trade secrets including the loss of its competitive advantage in the industry.

82. Defendant's use of RNR's proprietary website data to solicit its customers caused financial harm to RNR through loss of customers and business.

### Count IV - Breach of Fiduciary Duty

83. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 82 as if fully set forth herein.

84. Defendant, serving as one of RNR's Vice Presidents, owed fiduciary duties of loyalty, care, and good faith to Plaintiff.

85. Defendant breached his fiduciary duties to Plaintiff by:

    a.    misappropriating company funds for his personal use;

    b.    retaining company property after his termination;

    c.    aiding RNR"s competition by sharing information and resources about RNR's business with its competitors;

    d.    performing work for the Pullman Park Authority and Butler City Council on company time;

    e.    binding RNR to advertising deals and trade show contracts that were never, and would never, be approved by RNR management;

    f.    diverting RNR's funds to pay for expenses incurred by his other organizations;

    g.    stealing RNR's proprietary business information and trade secrets including RNR's customer list, and vendor and supplier lists during his employment;

    h.    defaming RNR in the industry during his employment;

    i.    using his knowledge of RNR's business and RNR's customer list and vendor and supplier lists to sell counterfeit products meant to mislead consumers into thinking the product Defendant sold was RNR's product; and

    j.    taking other action adverse to RNR's interests as may be discovered through further litigation and investigation.

86. Defendant's breach of fiduciary duty resulted in injury to RNR and benefit to the Defendant.

87. RNR suffered financial losses as a result of Defendant's misappropriation of company funds.

88. Defendant benefited from his breach by using Plaintiff's funds for his personal use and to support his ambitions of advancing in his positions in other organizations unrelated to RNR's business.

**Count V – Defamation**

89. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 88 as if fully set forth herein.

90. RNR has spent decades developing its reputation as a leading provider of top-quality equipment in the rescue, first, emergency services communities.

91. These tight knit communities deal with life and death situations, which makes reputation paramount to retaining customers and growing RNR's business.

92. After his termination by the Company, Defendant made false statements about RNR to RNR's customers and within the industries RNR operates in.

93. Defendant also published these defamatory communications to third parties including RNR's suppliers and vendors in addition to RNR's competitors.

94. Plaintiff suffered harm to its reputation in the industry as a result of the publication of these defamatory communications.

95. Defendant's defamatory statements are outrageous in nature because he knew they were false when he made them, and Defendant's statements were and continue to be nothing more than a malicious attempt to injure RNR in an effort to retaliate against RNR for Defendant's termination.

**Count VI - Tortious Interference with Business Relations**

96. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 95 as if fully set forth herein.

97. At all times relevant, RNR maintained business relationships with its current customers.

98. At all times relevant RNR also sought to build new business relationships with prospective customers.

99. Defendant took purposeful action specifically intended to harm RNR's existing relationships and to prevent RNR from developing new business relationships.

100. Defendant intentionally interfered with these relationships by using RNR's proprietary website data to solicit these customers after his termination.

101. Defendant's actions were without privilege or justification.

102. Defendant had no right to use RNR's proprietary website data to solicit its customers after his termination.

103. Defendant also interfered with RNR's ongoing and prospective business relationships by selling counterfeit products as if they were RNR's thereby harming RNR's reputation in the community through the sale of inferior counterfeit products.

104. Defendant's actions caused RNR to lose business and suffer financial harm.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Weinel Group Corp. d/b/a Rock-N-Rescue respectfully requests that this Court enter judgment in its favor and against Defendant John Morgan as follows:

A. Compensatory damages in an amount to be determined at trial for all financial losses directly resulting from Defendant's misconduct, including misappropriated funds, lost business, and damage to reputation.

B. Treble damages pursuant to 15 U.S.C. § 1117.

C. Exemplary damages for willful and malicious misappropriation of trade secrets.

D. A permanent injunction prohibiting Defendant from infringing on RNR's trademarks, from using RNR's proprietary information, soliciting its customers, and making false or defamatory statements about the company.

E. An order requiring Defendant to provide a full accounting of all funds misappropriated from RNR and all transactions involving RNR's proprietary information.

F. Disgorgement of all profits Defendant obtained through the use of RNR's proprietary information and misappropriated funds.

G. Reasonable attorney fees, expenses, and costs pursuant to 15 U.S.C. § 1117, 18 U.S.C. § 1836, and 12 Pa.C.S. § 5305.

H. Special damages pursuant to 42 Pa.C.S. § 8343.

I. Statutory damages pursuant to 15 U.S.C. 1117.

J. Prejudgment and post-judgment interest as allowed by law.

K. In the alternative, damages equal to a reasonable royalty for Defendant's use of RNR's trade secrets.

L. Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

THE LYNCH LAW GROUP, LLC

By: */s/ Nicholas R. Jimenez*
Justin A. Rick, Esq.
PA. I.D. No. 307461
Nicholas R. Jimenez, Esq.
PA I.D. No. 321144

Cranberry Professional Park
501 Smith Drive, Suite 3
Cranberry Township, PA  16066
Tel: (724) 776-8000
Fax: (724) 776-8001
jrick@lynchlaw-group.com
njimenez@lynchlaw-group.com
*Counsel for Plaintiff, Weinel Group Corp., d/b/a Rock-N-Rescue*

Dated:  February 2, 2026